ROBERT A. TITUS, AN INFANT BY HIS GUARDIAN *AD LITEM*, ETC., *ET AL.*, PLAINTIFFS-RESPONDENTS, v. RICHARD LINDBERG, BY HIS GUARDIAN *AD LITEM*, ETC., DEFENDANT-RESPONDENT, AND ROBERT SMITH AND MIDDLETOWN TOWNSHIP BOARD OF EDUCATION, DEFENDANTS-APPELLANTS.

Argued December 19 and 20, 1966—Decided March 20, 1967.

68

*Mr. William T. Wichmann* argued the cause for defendants-appellants (*Messrs. Wise, Wise, Wichmann & Berich,* attorneys).

*Mr. Thomas J. Smith, Jr.* argued the cause for plaintiffs-respondents (*Messrs. Parsons, Canzona, Blair & Warren,* attorneys; *Mr. Theodore D. Parsons, Jr.* on the brief).

*Mr. James D. Carton, III* argued the cause for defendant-respondent (*Messrs. Carton, Nary, Witt & Arvanitis,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division affirmed a judgment for the plaintiffs against all three defendants, Lindberg, Smith and the Board of Education. We granted certification on the application of Smith and the Board of Education.

On October 25, 1963 the plaintiff Robert A. Titus, who was then nine years old and a student at the Fairview School in Middletown Township, rode off from home on his bicycle to school. He arrived at the school grounds at about 8:05 A. M., entered along the bus driveway, and headed for the bicycle rack on the west side of the school building. As he came around a corner of the building, he was struck by a paper clip

which the defendant Richard Lindberg, then thirteen years old, had shot from an elastic band. Robert was seriously injured.

Lindberg was not then a student at Fairview but attended the Thompson School which was some distance away. Fairview had been designated by the school system's transportation coordinator as the pickup site for three schools including Thompson, and Lindberg was one of many students who customarily boarded school buses there. Up to two years earlier, Lindberg had attended Fairview and its records described him as "very rough" and a "bully." On the morning of the incident he arrived early at Fairview, fooled around with an elastic band for a while, and struck a student in the back with a paper clip about 5 minutes before he shot the one which injured Robert.

Though the school doors at Fairview did not officially open until 8:15 A. M., it was customary for quite a few Fairview students to start arriving on the school grounds at about 8 A. M. Some would arrive on their bicycles, as did Robert, and others would arrive on foot. Oftentimes the students played the game of "keep away" before the school bell rang. An early arrival would obtain a ball from a classroom and a team of students would try to keep it away from a second team. The first bell rang at 8:15 A. M., the students were supposed to be in their seats by 8:30 A. M. when the late bell rang, and classes began at 8:35 A. M.

The defendant Smith had been principal of Fairview since 1960. He testified that he "did the supervising of the arrival of the children" and that, although he had known of prior pranks and deportment problems connected with Lindberg, he was not aware of any earlier incidents involving conduct such as his shooting of paper clips. Smith's practice was to arrive at the school grounds at 8 A. M. and he had instructed his teachers to arrive at that time and prepare for and be in their classes at 8:15 A. M. so that they could maintain order as the students filed in. On his arrival at 8 A. M. he would supervise deliveries by the milk truck and would watch out

for the safety of children in the immediate area. He would then walk from the east side of the school to the west side where the buses began to arrive at 8:15 A. M. Sometimes he would walk through a corridor within the building and at other times he would walk along the outside of the building. At the time of the incident, he was walking inside the building. As he passed one of the windows of the building, he looked out and saw a group gathered around the stricken Robert. He went to the scene to administer assistance.

There were 560 students at Fairview and approximately 70 or 80 additional students arrived at the school grounds to board the buses. There were, in addition to administrative and part-time personnel, 19 full-time classroom teachers on the Fairview staff but none of them had been assigned any responsibilities in connection with the supervision of students before their entry into the classrooms. Smith testified that he made the rules governing the conduct of students on the school grounds and that he was charged with that responsibility. Although he stated that he told the students that school arrival time was from 8:15 A. M. to 8:30 A. M., he acknowledged his awareness that students began arriving at 8 A. M. and stated flatly that he maintained "supervision outside the building on the grounds between eight and 8:30."

The complaint, which was filed in the Law Division by Robert through his father Calvin as guardian *ad litem* and by his father individually, contained several counts. They charged the defendant Lindberg with having negligently shot the paper clip which injured Robert, the defendant Smith with having negligently failed to exercise supervision with the resulting injury, and the defendant Board of Education with having "actively and affirmatively failed to provide the necessary safeguards." After a full trial, the jury returned a verdict for the plaintiffs in the aggregate sum of $41,000 against all three defendants. A motion for new trial was denied by the trial court which also rejected a request that one-half the judgment be payable by Lindberg and the other half by Smith and the Board of Education. Its order directed

that the judgment be borne proportionately by each of the three defendants. The defendant Lindberg sought no review but the defendants Smith and the Board of Education appealed to the Appellate Division which affirmed without opinion. We granted certification on application by Smith and the Board. 47 *N. J.* 571 (1966).

■■ There is no dispute that Lindberg was soundly held liable for the injury caused by his conduct. And while there is dispute as to the liability of Smith, we are satisfied that the evidence fairly presented a jury question as to whether he had negligently failed to discharge his responsibilities with consequential injury to Robert. The duty of school personnel to exercise reasonable supervisory care for the safety of students entrusted to them, and their accountability for injuries resulting from failure to discharge that duty, are well-recognized in our State and elsewhere. See *Doktor v. Greenberg,* 58 *N. J. Super.* 155, 158–159 (*App. Div.* 1959), certif. denied 31 *N. J.* 548 (1960); *Eastman v. Williams,* 124 *Vt.* 445, 207 *A. 2d* 146 (1965); *Cianci v. Board of Education,* 18 *A. D. 2d* 930, 238 *N. Y. S. 2d* 547 (1963); *Domino v. Mercurio,* 17 *A. D. 2d* 342, 234 *N. Y. S. 2d* 1011 (1962), affirmed 13 *N. Y. S. 2d* 922, 244 *N. Y. S. 2d* 69, 193 *N. E. 2d* 893 (1963). See *Annot.,* "Personal liability of public school officers, or teachers or other employees for negligence," 32 *A. L. R. 2d* 1163 (1953); *Annots.,* "Tort liability of public schools and institutions of higher learning," 160 *A. L. R.* 7 (1946); 86 *A. L. R. 2d* 489 (1962).

In *Cianci v. Board of Education, supra,* a student was assaulted by another student in the school's play area and he brought an action for damages against the school principal and the board of education. New York's Appellate Division reversed the trial court's dismissal of the action against the principal, pointing out that "quite apart from any liability imposed by statute, under the common law there was imposed upon her as the principal, both the duty to be reasonably vigilant in the supervision of the pupils and the liability for her negligent performance of such duty (*Restatement of the Law,*

*Torts,* § 320)." 238 *N. Y. S. 2d,* at *pp.* 550–551. Similarly in *Selleck v. Board of Education,* 276 *App. Div.* 263, 94 *N. Y. S. 2d* 318 (1949), motion for leave to appeal and rehearing denied 300 *N. Y.* 764, 90 *N. E. 2d* 902 (1950), the court sustained a jury verdict for the plaintiff against both the supervising principal and the board of education where the evidence indicated that lack of proper supervision had resulted in a student's injury by another student who ran into him with his bicycle on the school grounds. 94 *N. Y. S. 2d,* at *p.* 321. See also the recent opinion in *Eastman v. Williams, supra,* where the Vermont Supreme Court made the following comments in the course of its holding that a jury question had been presented as to the liability of a teacher and a superintendent teacher for a student's injuries:

"In a limited sense the teacher stands in the parent's place in his relationship to a pupil under his care and charge, and has such a portion of the powers of the parent over the pupil as is necessary to carry out his employment. In such relationship, he owes his pupils the duty of supervision, and if a failure to use due care in such supervision results in injury to the pupil in his charge * * * [he is] * * * liable to such pupil. Common sense and fairness must call for the exercise of reasonable care in such duty of supervision, not only in the commission of acts that will not injure the pupil, but in a neglect or failure to act, when from such failure to act, injury results. See Doktor v. Greenberg, 58 N. J. Super. 155, 155 A. 2d 793, 795; Guyten v. Rhodes, 65 Ohio App. 163, 29 N. E. 2d 444, 445; 78 C. J. S. Schools and School Districts § 238, at 1197; 47 Am. Jur. Schools (1959 Supp.), § 60.1, p. 30. If the teacher is liable for misfeasance we find no sound reason why he should not also be held liable for nonfeasance, if his acts or neglect are the direct proximate cause of the injury to the pupil." 207 *A. 2d,* at *pp.* 148–149.

■■ Apparently Smith does not dispute the foregoing principles although he does seem to question that his responsibilities began before 8:15 A. M. We have no doubt on that score. In the first place he assumed the responsibility for supervising the school grounds beginning at 8 A. M. and was from that point on obligated to exercise due care. *Cf. Bauer v. 141–149 Cedar Lane Holding Co.,* 24 *N. J.* 139 (1957); *Freddi-Gail, Inc. v. Royal Holding Corp.,* 45 *N. J. Super.* 471

(*App. Div.*), certif. denied 25 *N. J.* 56 (1957); see *Indian Towing Co. v. United States*, 350 *U. S.* 61, 69, 76 *S. Ct.* 122, 100 *L. Ed.* 48, 56 (1955). In the second place, and wholly apart from the assumption, it cannot in any fair sense be said that his legal responsibility began only upon the opening of the classrooms at 8:15 A. M. Obviously the students would be expected to and could properly come to the school grounds during some short period before the classrooms actually opened. They customarily began coming at 8 A. M. and that was reasonable. Smith undoubtedly knew of their coming and of their "keep away" games. When all this is coupled with the fact that Fairview was also a pickup site for the older students, the dangers and the need for reasonable supervision from 8 A. M. on were entirely apparent. See Conway, J. dissenting in *Ohman v. Board of Education*, 300 *N. Y.* 306, 90 *N. E.* 2d 474, 478 (1949), motion for reargument denied 301 *N. Y.* 662, 93 *N. E.* 2d 927 (1950):

"Children have a known proclivity to act impulsively without thought of the possibilities of danger. It is precisely this lack of mature judgment which makes supervision so vital. The mere presence of the hand of authority and discipline normally is effective to curb this youthful exuberance and to protect the children against their own folly."

Smith contends that he was entitled to a direction on the ground that there was insufficient evidence to enable a jury to find negligence on his part. The record discloses the contrary. He had not announced any rules with respect to the congregation of his students and their conduct prior to entry into the classrooms. He had assigned none of the teachers or other school personnel to assist him in supervising the students and he undertook the sole responsibility. He then failed to take any measures towards overseeing their presence and activities, except at the point of the milk delivery and by walking from east to west around or through the building. While he was walking through the building there was no semblance of supervision on the grounds outside and

that was precisely when the injury to Robert occurred. Before then Lindberg had been fooling around and had struck another student while no supervisor was anywhere about. Bearing all of these circumstances in mind, it clearly cannot be said that the finding that Smith failed to take suitable supervisory precautions lacked reasonable support in the evidence. See *Mayer v. Housing Auth. of Jersey City*, 84 *N. J. Super.* 411, 423 (*App. Div.* 1964), affirmed 44 *N. J.* 567 (1965).

■ Smith advances the further contention that, even if lack of due supervision be assumed, Lindberg's deliberate conduct rather than Smith's negligence was the "sole competent producing cause of the injury." The jury presumably found that conduct of the type engaged in by Lindbergh was reasonably to be anticipated and guarded against and that Smith's failure to do so was a substantial factor in the occurrence. That being so, there was ample basis for finding proximate causation and holding Smith liable in addition to Lindberg. See *Mayer v. Housing Auth. of Jersey City, supra,* 84 *N. J. Super.,* at *p.* 426; see also *Rappaport v. Nichols,* 31 *N. J.* 188, 203 (1959):

"The defendants contend that, assuming their conduct was unlawful and negligent as charged in the complaint, it was nevertheless not the proximate cause of the injuries suffered. But a tortfeasor is generally held answerable for the injuries which result in the ordinary course of events from his negligence and it is generally sufficient if his negligent conduct was a substantial factor in bringing about the injuries. See Francis, J. in *Lutz v. Westwood Transportation Co.*, 31 *N. J. Super.* 285, 289 (*App. Div.* 1954), certification denied 16 *N. J.* 205 (1954) ; *cf. Hartman v. City of Brigantine*, 42 *N. J. Super.* 247, 261 (*App. Div.* 1956), affirmed 23 *N. J.* 530 (1957) ; *Melone v. Jersey Central Power & Light Co.*, 30 *N. J. Super.* 95, 105 (*App. Div.* 1954), affirmed 18 *N. J.* 163 (1955). The fact that there were also intervening causes which were foreseeable or were normal incidents of the risk created would not relieve the tortfeasor of liability. See *Prosser, Torts* § 49 (2d ed. 1955) ; *cf. Menth v. Breeze Corporation, Inc.*, 4 *N. J.* 428, 442 (1950) ; *Andreoli v. Natural Gas Company*, 57 *N. J. Super.* 356, 366 (*App. Div.* 1959). Ordinarily these questions of proximate and intervening cause are left to the jury for its factual determination. See *Martin v. Bengue, Inc., supra*, 25 *N. J.* 359, at *page* 374; *Brower v. New York Cent. & H. R. R. Co., supra*, 91 *N. J. L.* 190, at *page* 191." 31 *N. J.*, at *pp.* 203–204.

■ Smith complains about the trial court's charge on the issue of proximate causation but we find it adequate. The jury was told, in line with one of the requests to charge submitted by the appellants, that the proximate cause was the efficient one which naturally and probably led to the result and without which the incident would not have occurred. It was also told that in order to hold Smith liable, it must find that there was a failure to exercise due supervisory care and that this failure was the cause of the injury within the court's definition of proximate cause. Reading the charge as a whole, we are satisfied that the jury could not have been misled and that no prejudice resulted from any lack of artistry or specificity in the language used by the trial court. See *R. R.* 1:5–3(a); *Stackenwalt v. Washburn,* 42 *N. J.* 15, 26–27 (1964).

We find no error in the verdict and judgment against Smith and come now to the liability of the Board of Education. See *Cianci v. Board of Education, supra,* 18 *A. D.* 2d 930, 238 *N. Y. S.* 2d 547; *Selleck v. Board of Education, supra,* 276 *App. Div.* 263, 94 *N. Y. S.* 2d 318; *Ziegler v. Santa Cruz City High School District,* 168 *Cal. App.* 2d 277, 335 *P.* 2d 709 (*D. Ct. App.* 1959); *Tymkowicz v. San Jose Unified School District,* 151 *Cal. App.* 2d 517, 312 *P.* 2d 388 (*D. Ct. App.* 1957); *McLeod v. Grant County School District,* 42 *Wash.* 2d 316, 255 *P.* 2d 360 (1953); *Rice v. School District,* 140 *Wash.* 189, 248 *P.* 388 (1926). At the trial the appellants cited the statute which provides that no school district shall be liable for personal injury resulting "from the use of any public grounds, buildings or structures." *L.* 1933, c. 460—now *R. S.* 18:5–30. The statute was ruled by the trial court to be inapplicable under the restrictive interpretation in *Estelle v. Board of Education,* 26 *N. J. Super.* 9, 19 (*App. Div.* 1953), modified in other respects 14 *N. J.* 256 (1954). *Cf. Thompson v. Board of Education,* 11 *N. J.* 207, 209 (1953); *Schwartz v. Borough of Stockton,* 32 *N. J.* 141, 148 (1960). Apparently the appellants have accepted the trial court's ruling, for in their brief before us *R. S.* 18:5–30

is not at all relied upon or even cited; we consider it unnecessary to deal with it here.

The Board, placing some reliance on the vestiges of New Jersey's doctrine of "active wrongdoing" (see *Meyer v. Board of Education,* 9 *N. J.* 46 (1952); *cf. Hayden v. Curley,* 34 *N. J.* 420 (1961); *McAndrew v. Mularchuk,* 33 *N. J.* 172 (1960)), complains that the trial court erred in its charge by referring in similar language to the Board's and Smith's duty of care. But that was the very approach taken in the requests to charge submitted by the appellants jointly. Thus in their fifth request they asked that the jury be charged that in order to find Smith and the Board responsible, it must find "negligence or failure to exercise reasonable care in the supervision of the children coming to school and prior to entering school on the morning in question." In their sixth request they asked for a finding in favor of Smith and the Board, if the act of Lindberg was found to be "an untoward event not reasonably to have been anticipated with an exercise of ordinary care on the part of the school principal and the Board of Education." And in their seventh and final request they asked for a finding in favor of Smith and the Board, if it was found that the exercise of "ordinary and reasonable care" in the supervision of the children prior to their entering school on the morning in question could not have prevented the shooting of the paper clip by Lindberg. In the light of the foregoing, the Board is in no position to press its present complaint about the trial court's charge. See *Schult v. H. & C. Realty Corp.,* 53 *N. J. Super.* 128, 136 (*App. Div.* 1958), certif. denied 29 *N. J.* 279 (1959).

Though it was not cited to the trial court or the Appellate Division, *Amelchenko v. Freehold Borough,* 42 *N. J.* 541 (1964), is now cited by the Board in support of its contention that it was entitled to a directed verdict. See also *Hoy v. Capelli,* 48 *N. J.* 81 (1966); *Visidor Corp. v. Borough of Cliffside Park,* 48 *N. J.* 214 (1966). In *Amelchenko* the plaintiff was injured when he fell in a municipal parking lot which had not been cleared after a heavy snowfall. The

borough, with limited equipment and manpower, had planned its snow clearing program so as to give priority to the streets and had been unable to reach the parking lot despite work around the clock. We held that the borough's exercise of judgment would not be reviewed in the tort action and that the borough was entitled to a direction.

The situation in *Amelchenko* may readily be differentiated from the case against the Board. The Fairview School had been designated as a pickup site by the school system's transportation coordinator and, as a result, many older students customarily congregated on the school grounds in addition to the arriving Fairview students. The dangers and the need for supervision were evident, yet the Board apparently made no supervisory plans and took no precautions. Under the evidence the jury could find that no rules or regulations had been promulgated, no supervisory personnel had been assigned to the area, no guidelines had been given to the coordinator or the principal, and no checkups had been made. *Cf. Selleck v. Board of Education, supra,* 94 *N. Y. S. 2d,* at *p.* 321. On such finding, negligence on the Board's part could readily be determined without invading the holding or underlying policy of *Amelchenko*.

In any event, Smith having been found liable to the plaintiffs, the Board would be obliged under *R. S.* 18:5–50.4 to pay the judgment against him. That statute was originally enacted in 1938 (*L.* 1938, *c.* 311) and directed that each board of education shall save harmless and protect its individual teachers and members of supervisory and administrative staffs from financial loss arising out of claims and judgments "by reason of alleged negligence or other act resulting in accidental bodily injury to any person within or without the school building." A 1955 amendment carried the sympathetic legislative policy further by broadening the board's responsibility so as to include other board employees and claims and judgments for property damage as well as personal injury. *L.* 1955, *c.* 85. The proviso in the statute that the individual must be acting in the discharge of his

duties within the scope of his employment or under direction of the board was clearly and fully satisfied here. Although it has been held that the statute did not create a new cause of action which could be maintained directly against the board (*Hare v. Pennell*, 37 *N. J. Super.* 558, 563 (*App. Div.* 1955)), the individual sued could readily join the board as a third party defendant (*R. R.* 4:14–1) and, viewed realistically, the board rather than the individual would be the truly interested party. See *Cianci v. Board of Education, supra,* 238 *N. Y. S. 2d,* at *p.* 551; *Shaw v. Village of Hempstead,* 20 *A. D. 2d* 663, 246 *N. Y. S. 2d* 557, 558 (1964); *cf. Sandak v. Tuxedo Union School District,* 308 *N. Y.* 226, 124 *N. E. 2d* 295 (1954), where the Court of Appeals, after referring to New York's various school enactments including its indemnity statute on which ours was modeled, noted "that for all practical purposes, even though the suit in name be against the teacher, it is the school district which is the real 'party against whom the claim is made'." 124 *N. E. 2d,* at *p.* 298. See *Stearns v. Board of Education,* 137 *N. Y. S. 2d* 711, 713 (*Sup. Ct.* 1955).

In view of the above, it can matter little to the Board that the judgment is against it as well as Smith except on the issue of proration. On that issue, we agree with the Board that one-half of the judgment should be borne by Lindberg. The New Jersey act (*N. J. S.* 2A:53A–1 *et seq.*) provides that there shall be contribution among joint tortfeasors but that "[a] master and servant or principal and agent shall be considered a single tortfeasor." *N. J. S.* 2A:53A–1. While there is little precedent on the subject (see *Judson v. Peoples Bank and Trust Co.,* 25 *N. J.* 17, 37 (1957)), a fair construction of the act would lead to the conclusion that here the Board and its employee Smith should contribute no more than half of the judgment. The whole field of contribution is based on equitable considerations and the statutory provision expresses the widely held view that, by and large, it would be unfair to hold the master and servant or principal and agent for more than a single share. *Cf. Uniform Contribution*

*Among Tortfeasors Act* 1955 Revision § 2(b), 9 *U. L. A.* 127–128 *(Supp.* 1966) ; see *Wold v. Grozalsky,* 277 *N. Y.* 364, 14 *N. E. 2d* 437 (1938) ; *Oliver v. McPherson,* 24 *Misc. 2d* 1072, 205 *N. Y. S. 2d* 313 *(Sup. Ct.* 1960).

Lindberg's conduct was the most immediate and direct cause of the injury. The lack of due supervision was admittedly not as immediate and direct but was found on sufficient evidence to have been a proximate cause of the injury with resulting liability. These circumstances and the equitable considerations they delineate, clearly negate any suggestion that Lindberg should bear only one-third of the judgment with the remaining two-thirds to be borne by the Board in the light of *R. S.* 18:5–50.4. We are satisfied that the order below should be modified to the end that the Board and Smith be dealt with here as one tortfeasor within the contemplation of *N. J. S.* 2A:53A–1 and that the judgment be borne one-half by Lindberg and one-half by the Board on behalf of itself and Smith. The plaintiffs are in any event to be paid the entire amount of the judgment. Subject to that modification, the judgment entered in the Law Division is:

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS and SCHETTINO — 4.

*For affirmance as to Smith and reversal as to Board of Education* — Justices HALL and HANEMAN — 2.